**Ronald J. OSBORNE, Petitioner,**

v.

**Jack Raymond DUCKWORTH, Warden, and Indiana Attorney General, Respondents.**

No. S82–558.

United States District Court,
N.D. Indiana,
South Bend Division.

July 21, 1983.

John L. Gubbins, Chicago, Ill., for petitioner.

Kermit R. Hilles, Deputy Atty. Gen., Indianapolis, Ind., for Linley E. Pearson, Indiana Atty. Gen.

## MEMORANDUM and ORDER

SHARP, Chief Judge.

### I.

This case is presently before the court on a petition for writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by an inmate at the Indiana State Prison at Michigan City, Indiana. It is conceded by the respondents that petitioner has exhausted his available state court remedies pursuant to 28 U.S.C. § 2254(b), (c). See also, *Anderson v. Harless,* —— U.S. ——, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982); *Rose v. Lundy,* 455 U.S.

509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); and *Duckworth v. Serrano,* 454 U.S. 1, 102 S.Ct. 18, 70 L.Ed.2d 1 (1981). Further, the complete state court record has been presented to, and carefully examined by, this court. *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

Petitioner, Ronald J. Osborne, is a state prisoner confined at the Indiana State Prison at Michigan City, Indiana. Petitioner was convicted in the Adams Circuit Court of two counts of kidnapping and one count of theft for which he received two fifty year terms for kidnapping and a four year sentence for theft, all sentences to run concurrently. These convictions were affirmed on direct appeal by the Indiana Supreme Court in *Osborne v. State,* Ind., 426 N.E.2d 20 (1981).

In this action petitioner, who is represented by counsel, contends that his rights were violated because the state had allegedly not preserved the recording of a statement made to the police; because the prosecutor had a piece of paper in his hand while cross-examining a defense witness; because on the first day of jury selection he was brought into the courtroom in handcuffs; and because of the totality of the circumstances. These issues were presented to the Indiana Supreme Court in petitioner's direct appeal.

Petitioner's first allegation is that the Adams County Sheriff's Department had destroyed the tape recording of a statement by Vickie Wigger, one of the kidnap victims. Petitioner moved for a discharge or a mistrial based on the grounds that a tape recording of a statement which may have been potentially exculpatory had been destroyed by "state agents prior to trial." Review of the record indicates that the deputy sheriff may have been confused as to whether this statement by Wigger was actually recorded.

Even assuming that a recording of a statement made by Wigger had been destroyed this does not necessarily mean that any of petitioner's federally protected rights have been violated or that potentially exculpatory evidence had been withheld from him. The record establishes that Wigger never made any statements which were exculpatory to the Petitioner:

Q. And from the time that you got to the police down there in Delaware County, from the time you got up to Decatur, from the time you gave any statements in Decatur, from the time of trial in March of Mr. Osborne, to the time now have you always continued to give the same statement?

A. Yes.

Q. As to the facts, and the same version?

A. Yes.

Q. And have you ever, ever given the police any statement which in any way would relieve the defendant of any responsibility of these charges?

A. No, sir, not at all.

Q. And in essential parts your statements to the police have always been the same, is that correct?

A. That is correct.

(Tr. 539–540).

The Indiana Supreme Court was correct in finding that there was no denial of due process to the Petitioner. *Osborne v. State, supra,* at 23. Knowing and deliberate concealment of exculpating evidence may justify habeas corpus relief. *Lockett v. Blackburn,* 571 F.2d 309 (5th Cir.1971), *cert. denied,* 439 U.S. 873, 99 S.Ct. 207, 58 L.Ed.2d 186 (1979). However, here the statement may not have actually been recorded; by Wigger's own testimony there was no exculpatory statement and there is nothing to indicate that the state purposefully destroyed or withheld this information. Indeed, Osborne's counsel had known that Wigger made a statement to the police several months before the trial. *Osborne v. State, supra,* at 23. Thus, there is no merit to petitioner's contention that the State violated a constitutionally protected interest by its alleged destruction of, or failure to preserve, a statement purportedly made to the police.

## II.

A second issue raised by the petitioner in his application for federal habeas relief is that the conviction was obtained by prosecutorial misconduct in that the prosecutor had a piece of paper in his possession while cross-examining a defense character witness, and attempted to lead the jury and witness into believing that he had a copy of an insurance claim made out by the witness. The standard utilized by federal courts in reviewing the actions of state prosecutors under § 2254 is that there must either be a violation of a specific constitutional guarantee or the prosecution's conduct must render the entire trial fundamentally unfair. See, e.g., *Branch v. Estelle,* 631 F.2d 1229 (5th Cir.1980). Here the gist of petitioner's allegations is that Brian Hensley testified as a character witness on behalf of the petitioner. (Tr. 716–21). It had been stipulated that the petitioner was carrying Hensley's pistol when he was arrested. (Tr. 67, 459–61). On cross-examination Hensley admitted that he had turned in an insurance claim on the pistol as having been stolen (Tr. 721–22), and when the prosecutor asked him whether or not it had in fact been stolen, he replied, "Well, kind of both." (Tr. 724). Defense counsel moved for a mistrial on the grounds that he assumed the piece of paper in the prosecutor's possession to be the insurance claim which had not been provided in discovery and/or that the prosecutor had engaged in misconduct by "waving around a piece of paper" designed to lead the witness, if not the jury, to believe that the State "actually had an insurance claim." (Tr. 727). The prosecutor stated that he did not have the insurance claim. (Tr. 886).

The seminal case dealing with questions of alleged prosecutorial misconduct is that of *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). In that case Justice Sutherland, writing for the Court, declared:

(The Prosecutor) is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape nor innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." 295 U.S. at 88, 55 S.Ct. at 633.

A careful reading of *United States v. Rodriguez,* 627 F.2d 110 (7th Cir.1980) and the cases cited therein reveals the degree of concern the Court of Appeals for the Seventh Circuit has consistently displayed where acts of prosecutorial misconduct are alleged. Nonetheless, the Supreme Court pointed out emphatically in the recent case of *United States v. Hasting,* —— U.S. ——, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), in reversing a decision of the Seventh Circuit, that "the harmless error rule of *Chapman* (*v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)) ... may not be avoided by an assertion of supervisory power, simply to justify a reversal of ... criminal convictions." —— U.S. at ——, 103 S.Ct. at 1978.

A further nuance of the "harmless error" question regarding alleged prosecutorial misconduct was pointed out by this court in *Morrison v. Duckworth,* 550 F.Supp. 533 (N.D.Ind.1982). At page 537 of said opinion, this court held as follows:

Where the case involves a petition for writ of habeas corpus as opposed to a direct appeal, the habeas court must first determine whether the prosecutorial misconduct constituted constitutional error. See, e.g., *United States ex rel. Smith v. Franzen,* 660 F.2d 237 (7th Cir.1981). If the habeas court concludes that the prosecutor's improper remarks did indeed constitute constitutional error, the standard to be applied is a strict one.

A constitutional error will not be found harmless unless the court determines that it was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). "(U)nless there is a reasonable probability that the improperly admitted (questions) contributed to the conviction, reversal is not required." *Schneble v. Florida,* 405 U.S. 427, 432, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972).

*United States ex rel. Allen v. Franzen,* 659 F.2d 745 (7th Cir.1981).

If, on the other hand, the habeas court concluded that the prosecutorial misconduct does not rise to the level of constitutional error, the habeas court should apply the state's harmless error rule. See, generally, *Chapman v. California,* 386 U.S. 18 at 21–22, 87 S.Ct. 824 at 826–827; *Donnelly v. DeChristoforo, supra,* 416 U.S. [637] at 643, 647–48, 94 S.Ct. [1868] at 1871, 1873–1874 [40 L.Ed.2d 431].

Turning now to the facts of this case, it is clear that the State possessed only the information that Brian Hensley had claimed that the gun had been stolen. This is information or work product, not evidence which the trial court ordered the State to disclose. That petitioner's trial counsel apparently failed to learn about the claim submitted by their own witness cannot be deemed to be the fault of the State.

Petitioner contends that the prosecutor engaged in misconduct when he "waved" a sheet of paper while questioning the witness. However, the paper did not impeach Hensley. Hensley impeached himself by his own statements. It stretches credulity to argue that Hensley could have been duped into believing incorrectly that he had filed an insurance claim on State of Indiana letterhead. (Tr. 728).

When the prosecutor asked him about the claim, Hensley could have told the truth or he could have lied. If the witness had filed no such claim he would have so testified regardless of what the prosecutor held in his hands (or "waved" around the room, if that is what he did). Encouraging a witness to be truthful certainly does not amount to prosecutorial misconduct. Thus, irrespective of which harmless error standard, state law or constitutional, is applied herein, the prosecutor's conduct does not amount to prosecutorial misconduct nor does it violate any specific constitutional guarantee nor render the trial unfair. This allegation does not state a claim under § 2254 for which relief can be granted.

### III.

Petitioner's next ground for relief, *viz,* his being seen in handcuffs by some of the veniremen effectively deprived him of a fair trial by graphically undercutting his presumption of innocence, raises a far more troubling question than either of the claims already presented. It is true, as respondents point out, that petitioner was brought into court in handcuffs only on the first day of jury selection, i.e., this was the only occasion on which this occurred. The trial court and Petitioner's counsel raised this question during voir dire of the jury. (Tr. 153–155). Petitioner's counsel also reminded the jurors who had seen Petitioner in handcuffs of the legal presumption of his innocence and asked those who had formed an opinion of guilt because of the manner in which petitioner had been brought into court on the first day to raise their hands; none did. (Tr. 155). There was extensive voir dire of prospective jurors and several jurors were excused by one party or the other because of bias. Finally, Petitioner's counsel did not move to withdraw the case from the jury until *after* final instructions had been read to them.

The state courts determined that "there was no evidence of prejudice in the jurors." *Osborne v. State, supra,* at 23. Based on these facts, the respondents urge this court to hold that no prejudice occurred to petitioner by virtue of his having been seen in handcuffs by members of the venire.

In a carefully researched memorandum, petitioner argues vehemently that his ap-

pearance before eight[1] members of the venire panel in a fettered condition constituted a violation of his right to a fair trial before an impartial jury. Petitioner contends that the logical thing for the trial court to have done would have been either to dismiss from the panel of prospective jurors those individuals who admitted to having seen petitioner in handcuffs, or at the least to have declared a mistrial at the close of evidence when eight of the members of the jury admitted to having seen petitioner in handcuffs. This court agrees.

It is axiomatic that a criminal defendant has the right to appear before the jury free from shackles or other forms of physical restraint. *Illinois v. Allen,* 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970); *Harrell v. Israel,* 672 F.2d 632, 635 (7th Cir.1982); see also, generally, 90 A.L.R.3d 17 (1979). While it is true that the use of physical restraints has been upheld to restrain disruptive conduct, *Illinois v. Allen, supra,* and to maintain courtroom security even in the absence of disruptive conduct, *Loux v. United States,* 389 F.2d 911, 919 (9th Cir.), *cert. denied,* 393 U.S. 867, 89 S.Ct. 151, 21 L.Ed.2d 135 (1968), the overwhelming potential for prejudice resulting from jurors seeing the accused in fetters constitutes a strong ground for discouraging such an appearance. Thus, as the Court of Appeals for the Seventh Circuit held in *Harrell v. Israel, supra,*

> (b)ecause of the potential for prejudice, this court has required a showing of "extreme need" to justify the use of physical restraints at all. *United States v. Garcia,* 625 F.2d 162 (7th Cir.), *cert. denied,* 449 U.S. 923 [101 S.Ct. 325, 66 L.Ed.2d 152] (1980); *United States v. Esquer,* 459 F.2d 431 (7th Cir.1972), *cert. denied,* 414 U.S. 1006 [94 S.Ct. 366, 38 L.Ed.2d 243] (1973).

672 F.2d at 635–36.

It is clear from a review of the record that the Adams Circuit judge was well aware of the potential difficulties latent on the question of prospective jurors seeing the petitioner in handcuffs, and this court notes with approval the careful manner in which the trial judge sought to rectify the situation. It is of no little import as well that the Indiana Supreme Court affirmed the Adams Circuit court's judgment on appeal.

Nonetheless, it is the role of this court sitting in habeas review to scrutinize the state court record for violations of a petitioner's constitutional rights. The Sixth Amendment's guarantee of a fair trial before an impartial jury is a fundamental tenet of our common law's Anglo-American heritage, and any act, purposeful or inadvertent, which impinges on that right must be subjected to the most searching of inquiries.

Here, there is no showing of a need for the defendant-petitioner to have been fettered in the presence of prospective jurors. While it is manifestly clear from a reading of the record that the act was inadvertent and the court strove diligently to correct the problem, this court must conclude that the prophylactic effect of the court's (and defense counsel's) admonitions to the jurors regarding the presumption of innocence in favor of the defendant-petitioner could not and did not overcome the violation of petitioner's Sixth Amendment right. Only a pre-voir dire dismissal of those veniremen who saw the petitioner in handcuffs could have effectively salvaged the situation without taking the drastic course of declaring a mistrial.

Accordingly, the petition for writ of habeas corpus is hereby GRANTED. The petitioner is to be released unless the State elects to retry the petitioner within 120 days. SO ORDERED.

---

1. It is unclear just how many of the veniremen actually saw the petitioner in handcuffs before trial; however, at the close of the evidence, the judge asked how many of the jurors had seen petitioner in fetters, and eight individuals raised their hands.